[Civ. No. 326.    Third Appellate District.—December 30, 1908.]

## MATTEO PRE, Respondent, v. STANDARD PORTLAND CEMENT COMPANY, Appellant.

MASTER AND SERVANT—INJURY TO SERVANT FROM HOT CLINKERS—WARNING—KNOWLEDGE—DUTY TO AVOID INJURY—OPERATIONS OF FELLOW-SERVANTS — MASTER NOT RESPONSIBLE.—When plaintiff was set to work with fellow-servants, with usual appliances for removing cooling clinkers from a heated pile known by plaintiff to be heated, and to have issued from the furnace in defendant's cement works, and was injured by the caving down of the heated pile, it appearing without dispute that he was instructed as to his work, and warned against undermining the pile, and that it must be left on a slope, and that the operations of the servants were constantly changing as the work progressed, it was the duty of the plaintiff to avoid injury not only from his own work, but also from the operations of his fellow-servants; and where there was no proof of negligence of the defendant employer other than the mere fact of the injury, it is not responsible therefor.

ID.—SERVANT'S OPPORTUNITIES OF KNOWLEDGE—CHANGING CONDITIONS OF WORK—SAFETY OF PLACE COMMITTED TO SERVANTS.—When no one representing the master has any better opportunity of knowing the changing conditions of danger in the work than the servant, and the master has done all that is incumbent upon him in providing the safety of the place in which his servants are to work, and commits the safety of it to them to be attended to by them as emer-

gencies may arise during the progress of the work, then, if the place becomes unsafe by reason of changes incidental to the progress of the work, or by reason of the conduct of the fellow-servants of any servant receiving injury, the master will not be responsible therefor.

ID.—BURDEN OF PROOF OF NEGLIGENCE—ACCIDENT NOT PRIMA FACIE EVIDENCE.—The plaintiff had the burden of proof to show that his injury was owing to the negligence of the defendant; and, under the circumstances appearing, the mere happening of the accident is not *prima facie* evidence of neglect on the part of the master.

ID.—KNOWLEDGE OF DANGER FROM HEATED PILE—MASTER NOT REQUIRED TO WARN SERVANT.—When it appears that plaintiff knew the danger from the heated pile, and must have known thereof by use of his natural senses, the master owed him no duty to inform him that there were hot clinkers therein, or to warn him against the danger from heat therein.

ID.—CORRECT INSTRUCTIONS—DISREGARD BY JURY—IMPROPER VERDICT—DUTY TO GRANT NEW TRIAL.—When the court correctly instructed the jury as to the law applicable to the evidence, which, if the jury had obeyed, would have required a verdict for the defendant, but which it disregarded in rendering an improper verdict for the plaintiff, it was the duty of the court to grant a new trial.

ID.—PROVINCE OF COURT AND JURY—NEGLIGENCE—ASSUMPTION OF RISK BY PLAINTIFF.—Under the evidence, it was not for the jury alone to say whether the facts known to plaintiff ought to have apprised him of the danger, and whether he assumed the risk of a danger known to him from which he suffered the injury, and which he could have avoided by the exercise of ordinary prudence. Though the question of defendant's negligence was for the jury, yet, where only one inference can be reasonably drawn from the evidence, the court is not bound by the conclusion reached by the jury, but may itself draw that inference. A jury has not an unrestrained and unlimited right to infer negligence from a given state of facts.

ID.—ERROR IN REFUSAL OF REQUESTED INSTRUCTIONS—CHANGE IN PLACE OF WORK.—It was error for the court to refuse to give instructions requested by the defendant, based upon an issue presented by the answer, to which proof was addressed, and which was otherwise wholly ignored by the court, relating to the facts that the place where plaintiff was working was constantly changing, and that such change was brought about by plaintiff or his fellow-servants in the progress of the work. Such instructions should have been given in connection with the instructions in regard to a "safe place to work."

APPEAL from a judgment of the Superior Court of Napa County, and from an order denying a new trial. H. C. Gesford, Judge.

The facts are stated in the opinion of the court.

Myrick & Deering, for Appellant.

Bell, York & Bell, and John T. York, for Respondent.

CHIPMAN, P. J.—Action for personal injury.

It is alleged in the amended complaint that defendant is operating a cement plant known as the Portland Cement Works, Napa City; that prior to September 14, 1904, plaintiff entered the employment of defendant as a laborer at said works; that at the time of the injury complained of defendant was maintaining a room or house at its said plant, in which it stored ingredients used in manufacturing cement, commonly called "clinkers"; that such material was there stored in large quantities, forming a pile of considerable height; that after being stored in said room, said clinkers became heated to such extent as to severely burn any person on whom they might fall; that said room was so constructed that said clinkers, as they might be desired for use, could be caused to fall from such pile through holes which could be opened along one side of the floor of said room, into a shaft or conveyor below; that said clinkers, after being so stored, became slacked and "thereby became and were likely to run or slide, and when such holes were opened and such materials were thereby withdrawn from said room, the said materials which lay immediately above said holes would quickly run through said holes, and thereby would and did leave a high bank from said holes on said floor to the top of said pile of clinkers, and frequently, when a quantity of said clinkers had been so withdrawn, no more thereof would run down said slope or bank"; that defendant "did not provide any machinery or appliance for the purpose of starting the remainder thereof to run into said holes, but would and did direct its employees to go into said room in the trough or vacant space from which such clinkers had been drawn or run off, and shovel said clinkers from said bank into said holes. That such bank was likely at any time to cave in and start to run, and frequently did cave and start to run down from said bank to the vacant space from which such materials had been withdrawn, and

9 Cal. App.—38

would and frequently did fill up said vacant space where said employees were directed to go with said clinkers from such bank, and thereby cover such employees with said heated clinkers.'' It is then averred ''that defendant well knew about said matters hereinabove mentioned and said place was not a good; safe or secure place to work in; and said defendant', well knowing the need thereof, did not provide therein a good, safe or secure place to work in, nor good, safe or secure materials or appliances to work with therein''; that, knowing said facts, defendant ''directed plaintiff to go into said room or house at said plant' or works and to proceed to shovel said clinkers and cause the same to run into said holes. That' defendant did not inform plaintiff that said work was in any respect dangerous, and wholly failed and neglected to warn plaintiff of or concerning such or any danger therefrom, and wholly failed and neglected to furnish or supply plaintiff with a good, safe or secure place in which to do such work, or with a good, safe or secure tool or appliance with which to do such work. . . . That defendant well knew that plaintiff was wholly ignorant of any danger therefrom and without fault on his part, and while in said employ and engaged in said work so assigned to him by defendant and as directed by defendant, for want of due care and attention on its part, the pile of clinkers caved or slid from the bank thereof, by and through the carelessness ,and negligence of said defendant, and plaintiff was thereby thrown down and buried by the caving of said burning and hot clinkers, and was thereby burned, crushed and bruised, and received serious injury therefrom.''

A general demurrer was overruled and defendant' answered, denying specifically the averments of the complaint. For a separate answer it is averred: That at the time the plaintiff received the injury complained of he was at work causing a pile of clinkers to run through certain holes, there to be carried away by a belt passing underneath said holes; that plaintiff had been engaged in said work for some months and had been instructed by defendant how to perform said labor; that plaintiff was employed ''to cause said clinkers to pass through said holes, and in so doing it was necessary that said clinkers either be shoveled into said hole or that said clinkers be caused to cave down from the bank on the side of said hole''; that plaintiff knew that said bank of clinkers ''must cave or

run down in order that he perform the services required of him and which he had agreed to render''; that he knew that said clinkers were hot and would burn him if they came in contact with his person; that he knew each and every danger connected with his said employment, and thereby assumed all and every risk incident to his said employment; that plaintiff was, at the time he received the injuries complained of, guilty of contributory negligence which was the direct and proximate cause of the injuries received by him.

Resort to the uncontradicted testimony will make somewhat clearer the facts essential to a right understanding of the circumstances connected with the accident. The original materials of which clinkers are composed, and from which cement is made, are lime and clay—about sixty-two and one-half per cent lime. The raw material is first ground in a crusher, then run into what is called a ball mill, where it is ground into particles of the size of a mustard seed; thence it goes into what is called a tube mill and crushed into not quite the fineness of flour; next it goes into the kilns and is burned; thence it is run out on a platform and piled up and is put through the simple process of being wet; there is next to the outside platform or pile of clinkers a clinker building; the material comes from the kilns on a carrying belt, which runs over the clinker pile and, by means of a trip, drops its load at the piles; here water is put upon the material and it remains for a week or ten days to ''slack and age,'' the process causing heat ''enough to burn anybody.'' During the slacking process there is heat upon the surface of the pile while the interior is slacking, but does not stay upon the surface very long, and when about ready to be moved ''the heat that is on the interior of the pile cannot be seen or felt upon the outside . . . but down about six inches it is hot enough, down from six to twelve inches.'' Underneath this pile of clinkers and underneath the clinker building runs a belt upon which the clinkers were dropped through holes or slots in the floor of the platform and clinker building, the holes opening along the side of the piles. These holes occurred at intervals of about thirteen feet, and were about twelve or thirteen inches square, of which there were ten and were numbered 1, 2, 3 and so on. The clinkers were let down through these slots in succession, commencing with No. 1, the oldest material being over this slot where the carrying belt dumps first. The

material is first let down by a man underneath the opening who takes out the slide. "After the man gets through underneath, when this hole is empty, we put a man in there and he pokes it down with a bar. When the incline of the funnel (which forms by the material running out) is so great that it won't come down a man pokes it down with a bar or shovel." When the material would not run through by gravity it became necessary to send men to the clinker pile and work it down to and through the slots. The tools required for this work were a shovel, pick and a bar, eight to fourteen feet long, made of pipe with a point at one end like a chisel. When the clinkers are drawn from the different walls to the holes they are hot, but as exposed to the air they "cool off quick" before striking the belt; if they go "through fast enough they are hot when they strike the belt," and "to keep the tunnel from being overheated and to keep the dust out" a fan was installed in the tunnel where the belt ran.

Witness Gledhill, who had charge of the shift on which plaintiff went to work, was called by plaintiff. He testified in chief: That plaintiff was a laborer at defendant's works, and had been for two or three months prior to the accident; that a man was needed on the clinker pile and he set plaintiff to work there, and he went to work with four men, one plaintiff's brother, all of whom were old workmen and understood the work and were present when Gledhill gave plaintiff his instructions, as to which latter Gledhill testified: "The instructions that I gave him were that I told him to look out, it might cave down. That they should not undermine it, they should keep it on an angle of forty-five degrees. Well, I motioned to him. I told him as good as I could tell him. He could not understand me. . . . There were four men working on that clinker pile with Pre. I think they were all Italians. I know they couldn't talk English. I motioned to Pre not to undermine that pile. I took the shovel and showed him not to undermine the pile; that he should keep it on a slide so that it would not cave down. I think he commenced to work at hole No. 1. I went around there three or four times a shift. Sometimes a couple of times. I did not at any time motion to him as to the condition of the pile so far as heat was concerned. . . . They had taken out about thirty-eight or forty feet of the pile of clinkers and were working at hole No. 3 when the plaintiff was hurt. Two of the men

were supposed to work on the sides of the clinker pile and two of them on the face of the clinker pile, in front. It didn't make any difference which two worked on the face. On this particular night, on the 13th of September, 1904 (he went to work on the 11th), some of them were working on the sides and other part of them were working on the face. On this particular date the clinkers directly in front of the men were not old enough to answer all purposes for which we wanted it. For that reason they were pulling down the sides. . . . Four men moving that amount of clinkers in the period which I have stated, would be moving that amount very slowly. They were not continually moving them. The effect of the air upon clinkers would be according to how fast they poke it down. If they poke it down fast enough it would be hot; if they would not, the air would cool it. Would have to go into the pile from six to twelve inches to get hot cinders. It would have to stay in about two hours before it cools off a foot. The clinkers constantly roll down from the top if a man pokes it from the top. If he don't they won't.''

Cross-examination: ''The pile of clinkers has been used as it was used on September 14, 1904, for about two years. We have handled these clinkers in the manner they were handled on September 14, 1904, for about two years. . . . I saw this plaintiff working on the pile of clinkers several times after I had placed him to work there. At all of those times he was performing work in the manner in which I had told him to. . . . The steam and heat comes from the water they put on the clinkers. It comes from the pile of clinkers. I didn't tell the plaintiff in this case the clinkers were hot because he could find it out in a very short time after he worked there. A man commencing work on hole No. 1 and sending clinkers down that hole would have to work only a few minutes before he would expose hot clinkers. There were put down about two thousand tons of clinkers from September 11th to September 14th, or the evening of September 13th, and at that time the entire pile of clinkers was heated from a point six or eight inches from the surface. The platform on which the clinkers are deposited is about one hundred feet wide. . . . On the night of September 13th, when plaintiff was injured, all the clinkers back of the hole No. 3 in the middle of the pile had been removed. In the center of the platform

where the clinkers had been removed there might be a mound of about two or three feet around each hole. Pre was working on the sides of the clinker pile or on the face of the wall in front of him. There were no clinkers in back of him. . . . Clinkers were being shoveled from the sides of the clinker pile, to mix with the clinkers from the face of the clinker pile, because the clinkers in the face of the clinker pile were not old enough. . . . The sides of the clinker pile from hole No. 1 to hole No. 3 were about fifteen to twenty feet on September 13th, when plaintiff was injured. . . . We have never used any other kind of tool on that clinker pile in removing them. We are using the same kind of tools to-day. . . . The men working on the clinker pile sometimes have sacks on their feet to protect them from heat. That is quite common. When any of the holes are open and the clinkers commence to run down, it exposes some of the clinkers, say from twelve to thirteen inches from the surface, and when it runs down from the clinker pile it exposes the whole face from the side from which it runs down, and then shows the whole surface of that side, from twelve inches down, is warm. Anybody putting his hand on it could feel it. It does not steam. By touching it you could tell it was hot. It only steams when it is new. . . . Heat that is generated from this clinker pile being chemical heat will burn cotton or rubber in time. It does not cause it to inflame, just chemically heats it up. This chemical heat does not emit any heat; it is not perceptible except to the touch, and there is no radiation from it."

Redirect examination: "One could not handle that material with a shovel for a long time if he did not touch it with his hand without ever finding that it was hot. If you step into it when you are perspiring, or when your feet are damp, the chemical action with the dampness on your feet and the lime together immediately create a heat. You could not handle it with a shovel without getting into it where it was hot. If you got into it where it was hot it would show the heat. I was in the clinker pile three or four hours before the accident and was there about fifteen minutes after the accident."

The plaintiff was sworn as a witness and testified in chief: "Before working on the clinker pile I was working in the yard cleaning up. That work had nothing to do with the

clinker pile. I had had no experience with the handling of clinkers before I went to work on the clinker pile. . . . I went to work about 6 o'clock in the evening. The boss went in there with me and showed me how to shovel clinkers, and when the clinkers got stopped up to take a crowbar to make it go down into the tunnel below. He told me to do that kind of work. I worked there three nights. . . . After Mr. Gledhill showed me what to do I followed my instructions. I had to shovel the clinkers with a shovel and whenever the hole got clogged up so that it didn't run any more I had to take a crowbar and go and break it down, and I did that. . . . The last night I was working there I was working on the fourth hole. . . . Q. Were you shoveling the clinker from right in front of you or from the sides? A. Shoveling from the sides.'' He further testified: ''Something happened to me the last night. It came down a big pile of clinker on top of me. At that time I was on the side of the hole and I was trying to send down the clinkers with a crow-bar. The hole was stopped up. I was trying to drive it through. The clinkers that fell on top of me came from the front of me, and they fell on top of me they burned me. The clothes I had on was a pair of overalls, jumper, working shoes and a hat. (The witness exhibited part of his person to show the effect of his injuries. No claim is made of injury other than from burns.) Q. Did you know whether or not that clinker pile was hot? A. Certainly, know it was hot. Q. Ask him if he knew it was hot. A. Over in front I knew it was hot. Q. What do you mean by the front? A. In front of me. Q. Right in front of you? A. Well, above me. Q. Do you mean that you knew the wall right in front of you was hot? Did you know that wall was hot? A. That was near me was not hot. Q. That it was cold? A. Yes. Where the clinkers were being dumped they were hot. No one ever told me that this was hot where I was working. . . . The clinkers didn't hurt hardly anything on my clothes. Didn't burn hardly any. The stuff covered me. None of the men had been working on the big pile in front. We had all been working on each side of it. The front had not been disturbed. The clinkers fell from the front. In front of me and came right down on me. I had no time to get out of the way of it. I had not noticed any heat from the pile of clinkers while I was working there.''

Cross-examination: "I saw the clinker pile before I went to work on it. I saw it most every day. I never saw any hot clinkers on the pile until the night I was hurt. Q. You did not know there were hot clinkers on that pile until you were hurt, did you? A. Yes, I knew they were carrying hot clinkers there. Q. How did you know that there were hot clinkers there? A. Because sometimes I was passing near there I could feel that it was hot there. Q. You could feel that there were hot clinkers on that pile prior to September 13th, the heat from hot clinkers on that pile, had you? A. From where it would fall down, yes, I knew." He testified that he was working from the sides of the pile and that neither he nor any of the other men "took any clinkers from the pile in front." "Q. Explain how you removed thirty-eight feet of clinkers of that side, if they did not take anything in front, when they commenced at the wall? A. Because it goes down by itself." Question repeated and answered the same. "Q. Ask him if he does not mean by that last answer that what fell on him came down by itself. I think that is what he means. A. Yes." He was then again asked to explain how so much had been removed without taking anything from the front of the pile. "A. We was shoveling there for three days. Q. From the front; from the pile of clinkers in front of you? A. From that thirty-five feet, you see, they were shoveling there for three days." After some further answers he was asked: "Q. After you commenced work there, did you not remove all the clinkers from the first hole up to the hole where you were hurt? A. No, we had not removed it all. Q. What had not been removed? A. Not all." (Question repeated and same answer.) "Q. How much of it hadn't you removed? A. Maybe below three or four feet yet. . . . Q. Then you had removed all the clinkers from the first hole up to the fourth hole except about four feet of it? A. Yes. Q. Then you had removed sixteen feet in height of that clinker pile from the first hole to the fourth hole? A. I don't know if it was fifteen or sixteen feet high." He was then asked if it was not true that every night while they were working there, they were causing the clinkers to run down into these holes. "A. No, I didn't know that the clinker was coming down; no, the clinker was coming down by itself. We were shoveling on each side and the clinker in front coming down by itself. They

showed me how to do it, how to make the clinker come down." Again he answered: "They did not work it in any way to make the clinker fall. During all these three nights that I was working there the clinker came down gradually by itself. While I was working in front of this clinker coming down I did not feel any heat from it. I heard that the clinker was hot. My brother was working with me on that clinker pile. I don't know how long he had been working there. The clinker that did not went down by itself we shoveled it down into the hole. We were constantly going ahead into that pile of clinkers and the place where we were working was constantly changing by reason of the work we were doing. This accident happened about half-past 1 or 2 o'clock. After 12 in the night we took lunch at 12 o'clock. We took lunch about five or six feet from the fourth hole. We sat within five or six feet of this hole while eating our lunch. Eating our lunch occupied about half an hour. . . . While I was eating my lunch I didn't know that this mass of clinkers was liable to run down on me. I didn't know that night while I was working there that this mass of clinkers was liable to come down without me touching it; if I had known it, I wouldn't have stayed there. It was coming down by itself, and gradually as it came down, we shoveled it out of sight, and so on. . . . Some lumps of this clinker came down from this pile before I was hurt. Q. Well, now, after this clinker had fallen down a certain ways, it left a slope there, did it not? A. Yes. Q. Now, how could the clinker run down into this hole, after you had reached a certain angle, unless you used some means to cause it to run down? A. Well, it was coming down by itself; it had a certain kind of fall that it was always coming down by itself."

Redirect examination: He testified that the falling down he spoke of was "just a gradual fall." "Q. When it got back a little ways from the hole, and there would be a space between the hole and the bottom of the cinders, what would you do with that, which gradually came down on the face of the clinkers? A. They opened another hole ahead of it. Q. But between these holes is a space, we will say, of thirteen feet? A. Oh, that we shoveled. Q. Whenever it would drop down then and would not go into the hole, you had to shovel it, did you? A. Yes. Q. Did you ever see, all the time that you worked there, three nights, this wall come down in anywhere

near the quantity that it did when it fell on you? A. No, no, no, no.''

We have endeavored to present in the foregoing all the evidence submitted by plaintiff bearing upon the question of defendant's liability for the injury. Witness Gledhill was recalled as defendant's witness and testified: That he had heard plaintiff's testimony that from about the first hole in the clinker pile until about the fourth hole all that mass of clinkers was removed without either the plaintiff or the other men touching the mass of clinkers in front of them. ''That,'' said the witness, ''is impossible.'' He was asked to explain and replied: ''It has got to be continually poked to get down in them holes. We open this first hole. We have got to open it from the bottom and then it will start to run down until it gets to a certain angle, but it will run at different angles. Sometimes it stands up straight. Well, then, we start here at the side and poke it down at the side until we can open that, first getting to this on a right angle, and poke around to the front to get that. . . . Other times it comes down at an angle of forty-five degrees; then it has got to be poked down, for it won't run. It would not be possible for clinkers to run down through the first hole and the second hole without clinkers between those two holes being removed by hand or by some tool. . . . As the clinkers are taken from this pile, the mass of clinkers in front of the men working is constantly changing as the men work as they follow the mass of clinkers up.'' Upon cross-examination he testified that over the first hole, which was about two or three feet from the wall of the clinker building, the clinkers were about ten feet deep and at the back part of the clinker pile it was about two feet deep. In letting down the clinkers through the hole ''the funnel starts right from the top. . . . After the first pocket the clinkers do not come down of their own gravity on to the floor surrounding the hole unless we open the other holes; it would go down to the others, too, if we opened them, but we did not open the others until we get the first one empty. After the clinkers had run through the first hole there would be a part of the floor around that hole bare, and then they had to commence and shovel into the hole. At the time plaintiff was injured the material was not ripe enough for us and we instructed the men to take some of the old material from the sides. We never instruct a man to go in front of the pile with

a shovel.   If there is any shoveling ever done, it is shoveled on the side.   I mean to say that a man does not go directly in front of the clinker pile, but he stands to one side.   They poke the clinkers down through the hole with a bar.   It does not necessarily follow that the wall of clinkers in front of plaintiff was almost perpendicular to come down sufficiently to cover the plaintiff.   If the clinker pile was at an angle and it fell down, the plaintiff would have been covered if he was at the bottom near the hole.''

We have given the testimony at unusual length, as it seemed otherwise impracticable to convey a satisfactory conception of the character of the work which was set before plaintiff, and to enable one considering the situation to rightly determine the relative rights and duties of the parties to the controversy. Even with this very full statement of the testimony, it is difficult to determine just how or by what immediate circumstances the accident was caused, for the foreman was not then present and none of the men who were working with plaintiff testified, and plaintiff gives no clear account of how the accident happened.   We think, however, that enough of the facts stand uncontradicted to furnish a reasonable solution of the question involved.

Defendant moved for a nonsuit at the close of the evidence, which was denied, and defendant duly excepted to the ruling. The cause thereupon went to the jury, under instructions by the court, and a verdict was rendered for plaintiff, assessing his damages at $1,125.   Judgment on the verdict was accordingly entered, from which and from the order denying its motion for a new trial, defendant appeals.

Appellant confines the argument principally to alleged error in denying its motion for a nonsuit.   Further error is also assigned, arising out of certain instructions given or refused. We can see nothing to be gained by a discussion of the motions separately, and shall, therefore, address this opinion to the order denying the motion for a new trial.

It is contended by appellant: 1. That the evidence shows no negligence of defendant; 2. That the injuries received by plaintiff arose from the risk he assumed when he accepted and continued the employment; 3. That the injuries arose from the changing conditions made by the servant himself in the progress of the work.   For these reasons it is claimed that the verdict is against the evidence.

It is also urged that the court erred in some of the instructions given and in rejecting some which were asked. Also that the verdict is contrary to instructions given by the court.

Respondent's contention is: 1. That defendant was negligent in not providing a reasonably safe place to work, and in not maintaining it in a reasonably safe condition, and in not warning plaintiff of the danger of being burned; 2. That the doctrine of the assumption of risks has no application to dangers not contemplated by the servant, or where there is an extraordinary risk not known to the servant; 3. That it was for the jury to say whether the facts known to plaintiff ought to have brought home to him knowledge of the danger and whether, by his acceptance of the employment, he assumed the risk; 4. That the contention that the place of work was not permanent, but became unsafe by reason of the progress of the work and that the place of work was made by the servant, has no application to the facts in the case.

There is no claim made that there was danger of injury from, or that there was any injury done by, the force of the clinkers falling upon plaintiff. It is conceded that the danger to him and the injury received by him lay solely in the fact that there was heat in the cinders sufficient to burn him when brought in contact with them; and defendant's liability, it is claimed, arose from the fact that plaintiff was not warned of this danger. So far as the question of a reasonably safe place to work is concerned, there having been no danger of injury except from heat, it is important only as it may be said to have contributed to that danger. Neither is it claimed that plaintiff was not furnished with appropriate tools with which to work—these were simple and their use understood; they were a shovel, a pick and a long-handled bar with which to reach the cinder pile at a high point, when the workman was on the floor, or down to a low point when he was on top of the pile. It is undisputed that plaintiff was shown where and how to perform the work assigned to him. He was told not to undermine the pile, but keep the materials at a slope. We must presume that he had ordinary intelligence, and having ordinary intelligence he must be charged with knowledge of such facts, existing where he was at work, as would disclose themselves to one having such intelligence. The exercise of a very ordinary intelligence would, without previous warning, have shown him that to undermine the pile the cinders

might fall upon him.   And the same degree of intelligence
would have shown him that it would be unsafe to be where the
cinders were liable to cave down upon him.   Of this danger,
however, he was warned and instructed to avoid it.   He was
not warned of danger from heat.   But the undisputed testi-
mony is that he knew before he went to work on the clinker
pile that hot clinkers were dumped there from the furnace,
and he knew that these clinkers were hot when he was working
on the pile, for he so testified.   He did not qualify this knowl-
edge by saying that he knew the clinkers were hot but did not
know they would burn him.   Plaintiff's other witness testified
that a "man working on hole No. 1 and sending clinkers down
that hole would have to work only a very few minutes be-
fore he would expose hot clinkers," and for this reason he
was not told that the cinders were hot.   He had worked there
for three nights and the body of the pile had been removed,
except some at no great height at the sides, a distance of some
forty feet and to the fourth hole.   It is inconceivable that he
had not by this time learned that there were hot clinkers in
the pile—hot enough to burn him.   The undisputed evidence is
that the outer surface cooled off to a depth of six to twelve
inches and underneath this layer the cinders were hot.   They
cooled off when exposed to the air in passing slowly through
the holes in the platform, but in caving down a hot surface
was necessarily exposed and plainly discernible to the touch.
Defendant had installed a fan below the holes to aid in the
more rapid cooling off of the cinders.   When the accident
happened plaintiff was working, as he says, near the fourth
hole, and had been shoveling from the sides.   It does not
clearly appear where the clinkers came from which caused the
injury, but they must have caved down from the front.   This
front had been advanced from the first to the fourth hole
without accident, but how near it was to plaintiff, or from
what part of it, or because of what condition it then was in,
we have no evidence to guide us.   He worked on the sides
and on the front.   He testified: "While working in front of
this clinker coming down, I did not feel any heat from it.   I
heard that the clinker was hot."   He further testified: "We
were constantly going ahead into that pile of clinkers and the
place where we were working was constantly changing by
reason of the work we were doing there."   Still plaintiff tes-
tified that he knew the clinkers were hot and what he said in

not feeling heat when working simply confirms Gledhill's statement that it was not radiating. We do not think that any rule of law would hold defendant responsible for not having warned plaintiff against the danger from heat, for the testimony of plaintiff's witness was that he could not have worked there without learning the fact, and plaintiff himself testified that he knew the fact.

If it be said that the caving down of the hot clinkers was the cause of the injury, the answer is that plaintiff was instructed not to undermine the pile, and the same consequences of which he was warned he must have known would follow if the pile was undermined by one of his fellow-employees. It was his duty to avoid doing this himself, and the dictate of common prudence required that he should avoid the danger if done by another. We are unable to discover any rational ground upon which the jury was justified in its conclusion upon the facts as shown by plaintiff's evidence.

Respondent contends that defendant was guilty of negligence in not providing a reasonably safe place in which to work and maintaining it in safe condition. We cannot see that defendant could have furnished any different place in which to do the work than at the pile of material to be moved, nor that defendant could have maintained it in any different way. Furthermore, the place was necessarily, and, according to plaintiff's testimony, constantly changing by the very work he was doing. Part of the time the place of work was on top of the pile and at other times on the floor of the platform or building, either at its sides or in front of the pile.

It seems to us that the principles discussed in *Thompson* v. *California Construction Co.,* 148 Cal. 35, [82 Pac. 367], are applicable in this case. The injury there complained of arose from rock coming down a sloping bank where plaintiff was working. The court said: "There is nothing whatever to show that the defendant, or any of its servants in charge of the entire work or occupying the position of master with respect to plaintiff, had any better opportunities of ascertaining the conditions than the plaintiff. The rule applicable to such cases is that a master is not liable for dangers existing in the place where the servant is assigned to work, unless the master knows the dangers or defects, or might have known thereof, if he used ordinary care or skill in ascertaining them. (19 Am. & Eng. Ency. of Law, p. 92.) This rule applies with

greater force in cases where the conditions surrounding the
work are constantly changing, owing to the progress of the
work.   The rule is further modified by the proposition that
where the servant is under the same obligation as the master
to look for dangers in the place of work, and has equal facil-
ities for ascertaining them, and under these conditions con-
tinues the work, the master is not liable for any injury caused
by the dangers thus existing, unless in some manner he urges
or coerces the servant to continue the work after he himself is
aware, or should be aware, of the danger.   (19 Am. & Eng.
Ency. of Law, p. 130.)   In a case such as that under consid-
eration, where the dangers complained of may, to some extent,
arise from the changed conditions made by the servant him-
self in the progress of the work, he is under as much obliga-
tion as is the master to be on the lookout for such dangers.
The plaintiff had the burden of proving that his injury was
due to the negligence of the defendant.   There was no evi-
dence of such neglect other than the fact that the rock slipped
down and caused the injury.   Under the circumstances above
stated, the mere happening of the accident is not *prima facie*
evidence of neglect on the part of the master.''

While it is true that the direct cause of the injury was the
heat in the cinders, it is likewise true that plaintiff was
brought in contact with this heat solely by reason of the slip-
ping or caving down of the material.   Of this plaintiff was
cautioned against, and besides, it was an occurrence obviously
likely to happen, against which it was plaintiff's duty to guard
and to avoid any danger therefrom should it happen.   To hold
the master liable under such circumstances he could only
avoid the liability by standing over the servant and constantly
warning him of danger.   In speaking of the code rule (Civ.
Code, secs. 1970, 1971) the court further said: ''The duty of
the employer in this respect is not absolute.   He is not re-
quired at all hazards to furnish a reasonably safe place to
work.   His duty is fulfilled when he exercises ordinary care
for that purpose.''

In line with these views the learned trial judge instructed
the jury as follows:

''4. I instruct you that by the term 'risks of the business'
is meant such risks as the employee is as likely to know as the
master, and which are the natural and ordinary incidents of
the work the employee agrees to do, and which are liable to
happen in the performance of such work.

"5. I instruct you that under no circumstances is a servant legally entitled to demand an absolutely safe place in which to work. All that the law requires of the master is to furnish a place as reasonably safe as the proper carrying on of the work will reasonably permit. A master is not bound to anticipate and guard against every possible danger, but only such as can be foreseen by the exercise of reasonable care. An employer is not an insurer of the safety of the place in which his servant works."

"9. Plaintiff in working upon said clinker pile assumed not alone all the risks that he knew, but also all the risks he could have ascertained by the ordinary exercise and use of his natural senses.

"10. If you find from the evidence in this case that the plaintiff, while working in the clinker pile, knew or could have ascertained by the ordinary use and exercise of his natural senses that the clinkers were hot, I instruct you that defendant was under no duty to inform plaintiff that said clinkers were hot, and defendant is not guilty of negligence in failing to so inform him.

"11. If you find from the evidence in this case that the plaintiff, while working in the clinker pile, knew or could have ascertained by the ordinary use and exercise of his natural senses that the clinkers were hot and would burn him if he came in contact with them, then I charge you that plaintiff, in accepting employment to work on said clinker pile, assumed the risk of being burned by said clinkers, and your verdict should be for the defendant."

To our minds it seems clear that the jury wholly disregarded these instructions, and that had they followed them the verdict must, under the evidence, have been for the defendant. The following cases may be read with profit in this connection: *Fries* v. *American etc. Co.,* 141 Cal. 610, [75 Pac. 164]; *Killelea* v. *California Horseshoe Co.,* 140 Cal. 602, [74 Pac. 157]; *Corletti* v. *Southern Pac. Co.,* 136 Cal. 642, [69 Pac. 422]; *Hanley* v. *California Bridge Co.,* 127 Cal. 232, [59 Pac. 577]; *Limberg* v. *Glenwood L. Co.,* 127 Cal. 598, [60 Pac. 176].

"Where the master does all that is incumbent upon him in providing the safety of the place in which his servants are to work, and then commits the safety of it to them to be attended to by them as emergencies may arise during the

progress of the work, then if the place becomes unsafe by reason of changes incidental to the progress of the work, or by reason of the conduct of the fellow-servants of any servant receiving injury, the master will not be responsible.'' (4 Thompson on Negligence, sec. 3876.) This doctrine is quite fully discussed in *Callan* v. *Bull*, 113 Cal. 593, 603, [45 Pac. 1017]. See this case distinguished and the rule further discussed in *Hanley* v. *California Construction Co.*, 127 Cal. 232, [59 Pac. 577], cited by both parties. See, also, 2 Labatt on Master and Servant, ed, 1904, secs. 587, 588.

The evidence fails to bring this case within the rule stated in respondent's third point, namely, that it was for the jury alone to say whether the facts known to plaintiff ought to have apprised him of the danger, and whether, by his acceptance of the employment, he assumed the risk, for it is undisputed that he had knowledge of the very danger from which he suffered injury, and which, by the exercise of ordinary prudence, he could have avoided. It is true that the question of defendant's negligence was for the jury to determine. But where only one inference can reasonably be drawn from the evidence the court is not bound by the conclusion reached by the jury, but may itself draw that inference. It was said in *Hennessey* v. *Bingham*, 125 Cal. 627, 634, [58 Pac. 200, 202], cited by respondent: ''Negligence is the ultimate fact to be inferred from many probative facts. The inference is within the province of the jury, even when the facts are undisputed. When *different* conclusions as to negligence can reasonably be drawn from the admitted facts, it is not for the court to instruct the jury as to which is to be adopted.'' This is as strong a statement of the rule as may be found. But we do not understand that a jury has an unrestrained and unlimited right to infer negligence from a given state of facts. Otherwise the jury might draw absurd and unreasonable inferences which would result in gross injustice and the court be powerless to furnish relief.

Appellant complains that the instructions given wholly ignore the issue made by the pleadings, that the place where plaintiff was working was constantly changing, and the further fact that such change was brought about by plaintiff or by his fellow-servants, in the progress of the work. It is claimed that an instruction which omits all reference to a question of fact which the jury, under the evidence, must pass upon, is

prejudicially erroneous. (Citing *Killelea* v. *California Horseshoe Co.*, 140 Cal. 602, [74 Pac. 157].) The issue was made in the pleadings, and was met by evidence, and should have been presented to the jury by the court in connection with its instructions relating to a "safe place to work." Defendant's instructions embodying this feature of the case were refused. The case seems to have been submitted to the jury upon the theory that changing conditions in the place to work, brought about by the plaintiff in the course of the work itself, were immaterial. We think this was error.

In our opinion the trial judge should have granted the motion for a new trial.

The judgment and order are reversed.

Hart, J., and Burnett, J., concurred.